ACCEPTED
04-15-00222-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
6/17/2015 2:53:28 PM
KEITH HOTTLE
CLERK

## CAUSE NO. 04-15-00222-CV

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE FOURTH COURT |
| CARLOS AGUILAR, | § | OF APPEALS |
| DECEASED | § | SAN ANTONIO, TEXAS |

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
06/17/15 2:53:28 PM
KEITH E. HOTTLE
Clerk

_____

## MOTION FOR REHEARING
_____

**TO THE HONORABLE FOURTH COURT OF APPEALS:**

**NOW COMES** Clarissa Aguilar, as the sole surviving parent and Next Friend of Carlos Aguilar, Jr., Alyssa Aguilar, Andrew Aguilar, Marcus Aguilar, and Kaylee Aguilar, Minor Children (hereinafter "Movants"), and file the following Motion for Rehearing, and would show the following:

### I.

On June 4, 2015, this Honorable Court denied Appellee's Motion for Sanctions. Appellees respectfully move the Court to reconsider this order because Appellees have now obtained a reporter's record of sworn testimony from a court hearing on May 26, 2015, before the Honorable Jesus Garza. This record is attached to this motion and is filed in this Court.

This testimony shows beyond any reasonable doubt sanctions should issue. This testimony was not considered by this Honorable Court when it denied Appellee's Motion for Sanctions because not yet available to be filed in this court.

- 1 -

**II.**

On May 26, 2015, the Honorable Jesus Garza heard Movants' Motion for Contempt against Vanessa Arce and Her Counsel, Balmer. David G. Balmer failed or refused to appear for the hearing. Ryan Anderson did appear and gave sworn testimony concerning the frivolous appeal filed by David G. Balmer.

Balmer filed the notice of appeal. He did this the day the discovery compelled by this order was due to be answered. Furthermore, Balmer refused to answer the discovery.

Mr. Anderson testified Balmer filed the notice of appeal without first consulting Mr. Anderson, the appellate attorney for Vanessa Arce. *See* RR at 14. Mr. Anderson admitted the trial court order Balmer purported to appeal concerned discovery issues. *Id.* at 16. Mr. Anderson agreed with this Honorable Court that no statute declares such an order appealable under the Probate Code, and that the order does not appear that the order disposes of all parties or issues in a particular phase of the proceedings. *Id.* Mr. Anderson also agreed with this Honorable Court that no other statutory authority permitting a party to appeal from an interlocutory discovery order could be found. *Id.*

Mr. Anderson claimed Balmer's appeal was the wrong procedural mechanism to challenge the discovery order. *Id.* at 17. Anderson also testified all responsive documents had been produced, leading one to question why appellate intervention in a moot discovery dispute was warranted.

## III.

The Rules provide:

> If the court of appeals determines that an appeal is frivolous, it may--on motion of any party or on its own initiative, after notice and a reasonable opportunity for response--award each prevailing party just damages. In determining whether to award damages, the court must not consider any matter that does not appear in the record, briefs, or other papers filed in the court of appeals.

Tex. R. App. P. 45. Evidence shows Balmer's appeal is frivolous. Less egregious appeals have merited sanctions. *Mid–Continent Cas. Co. v. Safe Tire Disposal Corp.*, 2 S.W.3d 393, 395 (Tex. App.-San Antonio 1999, no pet.); *Diana Rivera & Assocs. v. Calvillo*, 986 S.W.2d 795, 799 (Tex. App.—Corpus Christi 1999, pet. denied).

Anderson testified all responsive documents had been produced. This can only mean there is no arguable basis for mandamus, appeal, or any conceivable appellate intervention.

This Honorable Court ordered Balmer to file in this court, on or before May 18, 2015, a written response showing cause why his appeal should not be dismissed for want of jurisdiction. He chose to ignore this Honorable Court's order and failed to file a response.

Objectively, all the evidence, as in 100% of the evidence, shows Balmer lacked any lawful basis to invoke this Court's jurisdiction over this discovery dispute. No reason has been offered by Balmer for filing this notice of appeal or invoking this Court's jurisdiction.

This notice of appeal defines frivolity.

Movants have suffered damages as a result of Appellate Counsel's frivolous appeal in this civil case and therefore request that this Honorable Court exercise its discretion to sanction Balmer $5,000 for the attorney's fees and costs incurred in having to respond to the frivolous appeal filed by Balmer.

## PRAYER

For these reasons, Clarissa Aguilar, as the sole surviving parent and Next Friend of Carlos Aguilar, Jr., Alyssa Aguilar, Andrew Aguilar, Marcus Aguilar, and Kaylee Aguilar, Minor Children, asks the appellate court to assess sanctions against Balmer for $5,000, and grant such other relief as the Court in fairness deems appropriate in this situation.

Respectfully submitted,

BY: "/s/ Ronald Rodriguez"
Ronald Rodriguez
State Bar No. 00788306
ron@ronaldrodriguez.com
Willard Clark
State Bar No. 24087307
will@ronaldrodriguez.com
The Law Offices of Ronald Rodriguez
A Professional Corporation
915 Victoria Street
Laredo, Texas 78040
Tel: (956) 796-1000
Fax: (956) 796-1002

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on all counsel of record on this June 17, 2015, in accordance with the Texas Rules of Civil Procedure.

"/s/ Ronald Rodriguez"

CAUSE NO. 2012PB4000048L2

| IN THE MATTER OF THE | § | IN THE COUNTY COURT |
| ESTATE OF CARLOS AGUILAR, | § | AT LAW NO. |
| DECEASED | § | WEBB COUNTY, TEXAS |

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
06/17/15 2:53:28 PM
KEITH E. HOTTLE
Clerk

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MOTION FOR ATTORNEY AD LITEM FEES AND

REIMBURSEMENT OF EXPENSES & MOTION FOR CONTEMPT AGAINST

VANESSA ARCE AND HER COUNSEL

BEFORE THE HONORABLE, JESUS GARZA, JUDGE

MAY 26, 2015

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 26th day of May, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Jesus Garza, Judge presiding, held in Laredo, Webb County, Texas:

Proceedings reported by Computerized Stenotype Machine; Reporter's Record produced by Computer-Assisted Transcription.

A - P - P - E - A - R - A - N - C- E - S

LAW OFFICE OF RONALD RODRIGUEZ
By:  Mr. Ronald Rodriguez
     Mr. Craig Smith
     Mr. Willard Clark
915 Victoria Street
Laredo, TX  78040
Appearing for Clarissa Aguilar

LAW OFFICES OF RYAN G. ANDERSON, PLLC
By Mr. Ryan Anderson
115 East Travis, Ste 1403
San Antonio, TX  78205
Appearing for Vanessa Arce

LAW OFFICE OF JESUS GUILLEN, PLLC
By:  Mr. Jesus Guillen
1308 San Agustin
Laredo, TX  78040
Appearing for Carla Aguilar and
Karime Aguilar, Minor Children

ATTORNEY AT LAW
By:  Mr. Sergio Lozano
1219 Victoria, Ste 3
Laredo, TX  78040
Appearing for Carla Aguilar and
Karime Aguilar, Minor Children

(Proceedings)

THE COURT: In 2012-48, the Estate of Carlos Aguilar. This is a Petition on a Motion for Ad Litem Attorneys' Fees and a Motion for Contempt Against Vanessa Arce and Her Counsel; who do we have for the record.

MR. RODRIGUEZ: Good afternoon, Judge. Ron Rodriguez, Will Clark, and Craig Smith. I'm here for Clarissa and her five children.

THE COURT: Do we have anyone for the other party?

MR. ANDERSON: Yes, Your Honor. Ryan Anderson for Vanessa Arce and for Ryan Anderson.

MR. GUILLEN: Jesus Guillen for the five children that Ronald Rodriguez represents.

MR. LOZANO: Sergio Lozano for Karime and Carla Aguilar.

THE COURT: There is two motions before the Court, one is a Motion for Contempt, another one for attorney's fees. Let's start with the Motion for Attorney Fees, is there any objection?

MR. ANDERSON: No.

MR. RODRIGUEZ: No objection.

THE COURT: All right. So that motion will be approved by the Court. Motion number two, Motion for

Contempt Against Vanessa Arce and Her Counsel. I would imagine, Mr. Rodriguez, you filed that motion?

MR. RODRIGUEZ: We did.

THE COURT: You want to go ahead and argue it for the Court.

MR. RODRIGUEZ: We need to present some evidence first, Judge.

THE COURT: How many witnesses do you have?

MR. RODRIGUEZ: We just have one.

THE COURT: Okay. Go ahead.

MR. RODRIGUEZ: Mr. Anderson.

THE COURT: Mr. Anderson, please raise your right hand.

(Mr. Anderson duly sworn in)

THE COURT: Please stake a seat, sir.

MR. RODRIGUEZ: May I proceed, Judge?

THE COURT: Yes, sir.

DIRECT EXAMINATION

BY MR. RODRIGUEZ:

Q. Mr. Anderson, I'm handing you Plaintiff's Exhibit Number 1, which is the order entered by this Court, have you seen that before?

I have a courtesy copy, Judge, of exhibit number 1.

THE COURT: Thank you.

Q. (By Mr. Rodriguez) And for the record, Mr. Anderson, that's the one that was served by all counsel that was signed. I'm sure you received a copy, does that look familiar to you, sir?

A. I've seen this. Yes.

MR. RODRIGUEZ: We hereby offer Plaintiff's Exhibit Number 1.

THE COURT: It's admitted, for the record.

Q. (By Mr. Rodriguez) Mr. Anderson, you are Ms. Vanessa Arce's lawyer, correct?

A. Yes.

Q. And you were aware of this order on or about the time that the Honorable Jesus Garza signed it, right, February 13, 2015?

A. Yes.

Q. And would -- first of all you've never produced on behalf of Vanessa Arce or Mr. Balmer never produced or complied with producing to us, Clarissa Aguilar -- a unredacted copy of mediated settlement agreement, have you?

A. I have not produced a unredacted copy of the mediated settlement agreement to you on behalf of Vanessa Arce.

Q. And Mr. Balmer hasn't either, correct?

A. To my knowledge, no, he hasn't.

Q. So will you agree with me that -- and by the way, was it your decision not to comply with the order, you and Mr. Balmer's?

A. The unredacted mediated settlement agreement was produced to the Court in November pursuant to the Court's order. Court reviewed it and had the option of presenting it to you.

MR. RODRIGUEZ: Objection. Nonresponsive. I'm going to reask it, Your Honor.

Q. (By Mr. Rodriguez) My question is, was it you and Mr. Balmer's decision not to produce it directly to me, as Clarissa's counsel, as Judge Garza ordered you to do so?

A. Because we had already produced a copy of it, yes, we didn't produce a second copy of it to you.

Q. And that was your -- you never produced a copy, ever, to me as ordered by Judge Garza, correct?

A. As I said, we produced a copy to the Court pursuant to the Court order. We did not produce a second copy of the order.

MR. RODRIGUEZ: Objection. Nonresponsive.

THE COURT: It's been asked and answered.

Q. (By Mr. Rodriguez) So it was your decision, yours and Mr. Balmer's decision, and you take full responsibility for not producing a diligent copy

directly to me, correct, as Judge Garza ordered?

A. I think it's been asked and answered but for the third or fourth time, we produced a copy of the unredacted mediated settlement agreement to the Court pursuant to the Court's order we did not produce a second copy of it directly to you.

Q. And Judge Garza ordered you to produce a copy directly to me in number one, page two of the order, correct?

A. No, that's not correct.

Q. Let me read this to you, "The Court now orders Vanessa Arce" -- and you are her agent, correct?

A. That I am her attorney, one of her attorneys in this proceeding.

Q. That Judge Garza orders Vanessa Arce to produce the following not more than 30 days after the date of this order is signed to counsel for Clarissa Aguilar -- that's me, "as the sole surviving parent, and Next Friend of Carlos Aguilar, Alyssa Aguilar, Andrew Aguilar, Marcus Aguilar and Kaylee Aguilar, minor children, number one, an unredacted copy of the mediated settlement agreement and counsel and Clarissa shall maintain this document as confidential and it may not be disclosed;" you never on behalf of Vanessa Arce produced an unredacted copy of the mediated settlement agreement

to me as ordered by Judge Garza, correct?

A. Asked and answered, but yet again, we produced a copy to the Court pursuant to the Court's order we did not produce a second copy of it directly to you.

Q. I'm talking pursuant to this order Exhibit Number 1, you didn't comply?

A. I've answered your question, counsel.

Q. You need to answer yes or no, Mr. Anderson, did you produce a copy as ordered by Judge Garza directly to me?

A. I produced a copy directly to the Court.

MR. RODRIGUEZ: Objection, Your Honor, nonresponsive.

THE COURT: Objection overruled. Asked and answered.

Q. (By Mr. Rodriguez) Number two, your were ordered to produce -- by the way this order orders you on behalf of Vanessa Arce to produce these documents to me, correct? That's what it says, true?

A. It requires Vanessa Arce to produce them, she produced those documents to you.

MR. RODRIGUEZ: Objection. Nonresponsive. I'm talking about these orders.

THE COURT: Objection sustained. Ask the question again.

Q. (By Mr. Rodriguez) This order orders you, on behalf of Vanessa Arce, to produce these documents to me, correct?

A. Correct.

Q. Number two, you did not produce all documents concerning the purported settlement of the Estate's claim and the Estate's recovery, including a copy of the settlement agreement, a detailed accounting of the gross settlement, a breakdown and net settlement to the heirs of the estate, and all supporting documents; you did not produce that to me?

A. That's false, that was produced directly to you.

Q. Where, show me the document, sir, you have them with you?

A. You received them -- yeah, I have another copy of them -- you received them as part of the documents that were produced to your original request for production.

Q. Did you bring them here, sir?

A. I've got another copy of them. Sure.

Q. That has a gross settlement breakdown and settlement of all the heirs of the estate?

A. No, because that hasn't been done yet, Mr. Rodriguez. You don't understand the way an estate accounting is done. You can't have an accounting until we've decided where -- or the Court decides what

attorneys' fees are going to be paid out and, then, at that point, you can do an accounting saying what is left for the heirs and how it's going to be dispersed. So you can't have an accounting at this point in time because the money is not ready to be dispersed because of all of this action.

Q. So you have not produced a detailed accounting to me, correct?

A. There is no detailed accounting to produce.

Q. Number four, "all agreements affecting the claims of the estate;" you have not produced that, correct?

A. Yes. You have received that, that was all produced to you.

Q. You have not produced to me any split agreements with any lawyers in this case?

A. You've received all agreements that there are between any lawyers.

Q. There was not in the documents that you produced to me a -- by the way, Raul Vasquez claimed an interest in this estate, does he not?

A. Not that I know of.

Q. You are sure about that?

A. I'm sure of what I know, yeah.

Q. And why was it that you told me -- and Mr. Hagood told me the last time we tried to resolve this case --

that it was unacceptable, the offer that would be made, because Raul Vasquez did not approve of the property?

A. I didn't tell you any such thing and I don't know what Mr. Hagood would have said to you.

Q. So are you telling me, and are you telling this Court that he had no interest in any claims of this estate?

A. Yeah, I have no knowledge of Judge Vasquez having any interest in the claims of this estate.

Q. And he has no agreements with any of the lawyers on any fees that are going to be asserted against the estate?

A. Not anything that I know of.

Q. "All contingent fee agreements concerning the claims of the estate. Including all split fee agreements between the estate's attorneys and any other attorneys?"

A. That's all been produced to you.

Q. You only produced one document regarding the claim of the estate, are you saying that that's the only document that's been produced?

A. You've been produced all documents that there are, all of the agreements.

Q. Did you bring those with you?

A. I told you I've brought everything that was

produced to you.

Q. Which documents are they, sir, can you identify them for me?

A. It's a bunch of Baste stamped documents that were produced to you by Mr. Balmer.

Q. The unredacted mediated settlement agreement was not one of those documents, true?

A. Asked and answered.

Q. The March 30 -- March 13 was 30 days after the Judge ordered you to produce these documents, correct?

A. March 30th?

Q. March 13th, on or about March 13th --

A. No, that wouldn't be, February only has 28 days.

Q. On or about -- well 30 days after March 13th came and went without you making any further production?

A. Well that wasn't your question, your question was whether March 13th was --

Q. I'm asking an additional one, Mr. Anderson --

A. Okay, what's your question?

Q. Thirty days after February 13th came and went, you made no production or any effort to comply with Judge Garza's order, correct?

A. That's not correct cause I told you, you've already received all of the documents.

Q. Did you make any effort, any further effort, to

comply with Judge Garza's order?

A. Other than producing the documents that were required to be produced, no, there were no additional efforts other than producing the documents to you.

Q. You didn't send an email, a certified letter, you didn't say -- you and Mr. Balmer didn't send anything saying we produced all the documents, here they are and here's the unredacted agreement as ordered by the Court?

A. I don't know what Mr. Balmer did. I can tell you I did not send anything telling you that we had already complied with the documents that were required to be produced.

Q. What you did, though, Mr. Balmer filed a Notice of Appeal, correct? Are you familiar with that?

A. I think --

MR. RODRIGUEZ: May I approach, Judge?

THE COURT: Please do.

MR. RODRIGUEZ: I've marked that -- here's a courtesy copy -- I marked that as Exhibit Number 3.

Q. (By Mr. Rodriguez) Did you see that Notice of Appeal?

A. Not before it was filed. No.

Q. Aren't you the appellate lawyer in this case?

A. I'm an appellate lawyer, yes.

Q. Yeah, but you make an announcement as the

appellate lawyer, don't you, for Vanessa Arce?

A. Yes, I've announced myself as appellate lawyer, sure.

Q. No, but in this court, before?

A. I probably have in this court and I don't remember every announcement I've made.

Q. Okay. But why would the appellate lawyer in this case not sign the Notice of Appeal?

A. As I told you, I didn't see it. I wasn't in the office whenever it was being done, I was away.

Q. Did you confer with Mr. Balmer about this?

A. No.

Q. Did you see it?

A. I saw it after the facts.

Q. Okay. Are you familiar with the Court's order on this appeal that you all filed?

A. What order?

MR. RODRIGUEZ: May I approach, Judge?

THE COURT: Yes, sir.

MR. RODRIGUEZ: By the way, I give my offer in Plaintiff's Exhibit Number 3 --

THE COURT: Right.

MR. RODRIGUEZ: May I have a minute, Your Honor?

THE COURT: Yes.

MR. RODRIGUEZ: And this is -- what number is that, Mr. Balmer?

MR. ANDERSON: I'm Mr. Anderson, it's 5.

MR. RODRIGUEZ: Number 5, Judge, is the order from the Court of Appeals.

Q. (By Mr. Rodriguez) Have you seen that before?

A. Yes. But this isn't an accurate copy of the Court's order, someone's written on it.

Q. Oh, yeah, the handwriting?

A. Yes.

Q. The handwriting is mine.

A. Oh, okay. Other than that, yeah, this is the order of the Court.

Q. Actually, there is no handwriting, there's underlying, right?

A. I would presume that was done by hand. Yes.

Q. Actually, thank you for pointing that out, that's really what the underlying portion is, "In this appeal the order appellants seek to appeal concern discovery issues;" is that a true statement?

A. I guess -- I haven't really talked about what the appeal is suppose to be about.

Q. Oh, come one, Mr. Anderson --

A. No, I really haven't.

Q. You're the appellate lawyer and you're telling me

that you have not conferred with Mr. Balmer regarding this order from the Court of Appeals in a case that concerns the case that you are the appellate lawyer on?

A. Not at the time he filed it.

Q. I'm talking anytime?

A. Yeah, I talked to him since I saw this order.

Q. So is the Court of Appeals right that this order concerns discovery issues?

A. Yes.

Q. And the Court of Appeals says, "We have found no statute declaring such an order appealable under the Probate Code, and it does not appear the order disposes of all parties or issues in a particular phase of the proceedings;" is the Court of Appeals right on that?

A. I would agree with them on that.

Q. "Moreover, we cannot find any statutory authority that permits a party to appeal from an interlocutory discovery order;" are they right on that?

A. I would agree with them on that.

Q. And they ordered you and Mr. Balmer to file before their Court, before May 18th, a written respond showing why that appeal shouldn't be dismissed, correct?

A. They didn't order me to file anything.

Q. Well, they ordered your client, right?

A. No. They ordered Mr. Balmer to do it.

Q. Okay. And did you tell Mr. Balmer, "Hey, this is a frivolous appeal, you shouldn't be filing stuff like that, I'm the appellate lawyer in this. You shouldn't be filing stuff like that;" did you tell him that?

A. I told him that if he wanted to challenge it the way to do it would be by mandamus.

Q. Did you tell him, "So this is the wrong way to challenge?"

A. Right. It's the wrong mechanism.

Q. In fact, you were served with a Motion to Dismiss the Appeal that we filed properly, correct?

A. I may -- whether I got it from you directly or from Dave, I don't know.

Q. I handed you Plaintiff's Exhibit 4, immediately after you served that Notice of Appeal I filed the Motion to Dismiss the appeal, correct?

A. Yeah. It was fairly quickly done.

Q. Your Notice of Appeal was filed March 13th and my Motion to Dismiss was filed March 17th?

A. It was not my Notice of Appeal.

Q. Yeah, did you not sign it because you knew it was frivolous?

A. No. I didn't sign it because I didn't know about it before it was filed.

Q. Well, do you ratify it now that we're sitting

here today.

A. No, I just told you, it's the wrong procedural mechanism.

Q. I mean, do you want to sign off to it right now, as we're sitting here today, you want to ratify that Notice of Appeal? You're the appellate lawyer.

A. What did I just tell you --

THE COURT: It's been asked and answered.

THE WITNESS: I told you it's the wrong procedural mechanism.

Q. (By Mr. Rodriguez) Bottom line it's a frivolous appeal, right?

A. I wouldn't say frivolous, I mean, he just brought it up in the wrong mechanism. If he wants to complain about it he can still complain about it he just needs to do it procedurally in the correct form.

Q. No he can't because he waived mandamus, right?

A. How?

Q. Time?

A. Mandamus doesn't have a set time on this, Mr. Rodriguez.

Q. We have Langes(sic) and --

A. Langes(sic) does not have a set time when it is done by equitable principle.

Q. No mandamus proceeding was filed, right?

A.   No.  I don't think he filed one and I haven't.

Q.   And bottom line, can you think of any reasonable grounds for this advocate, either you or Mr. Balmer, to believe that this case had been reversed in this appeal -- on a Notice of Appeal?

A.   I think that the discovery order would be subject to challenge because I don't see any reason -- there was no hearing on it -- it was something that you just filed a new order after the Court had already ruled on this and many of the rulings had --

Q.   Mr. Anderson --

A.   Wait, you asked a question.

Q.   I'm talking about my appeal, the Notice of Appeal?

A.   I told you that I don't think appeal is proper procedure mechanism for it.

Q.   And you can't -- as you sit here today -- you can't give the Court any reasonable grounds for the advocate to believe that the case was reversed on this Notice of Appeal that was filed?

A.   I think that Mr. Balmer doesn't do appellate work and I think he did a mistake on the procedural mechanism he used.

Q.   Yeah, but you do.

A.   But I do what?

Q. Aren't you the appellate lawyer for Vanessa Arce?

THE COURT: It's been asked and answered, Mr. Rodriguez.

THE WITNESS: I answered that.

Q. (By Mr. Rodriguez) By the way, no response was ever filed, correct?

A. I believe Mr. Balmer communicated with the Court but I'm not sure. I think it was that they were dropping the appeal.

Q. There was no dismissal of the appeal filed to your knowledge, was there?

A. I don't know whether anything was filed. I do not have any knowledge of what he did.

Q. I'm handing you Plaintiffs Exhibit 8 -- in fact, we've asked the Court of Appeals -- pending before the Court of Appeals is a Motion for Sanctions to be filed with the Court of Appeals --

THE COURT: This will be considered Exhibit Number 5.

MR. RODRIGUEZ: I have them numbered, Judge --

THE COURT: For the purpose of the county clerks.

MR. RODRIGUEZ: However the Court wants to have that.

THE COURT: It's number 5.

MR. RODRIGUEZ: I offer that.

THE COURT: It's admitted.

THE WITNESS: This is the first I've seen this.

Q. (By Mr. Rodriguez) You don't talk to Mr. Anderson about the appeal on this case?

A. I don't talk about what appeal in this case and to whom?

Q. What is your role in this, Mr. Anderson, if it's not to handle appellate matters you make your announcement as the appellate lawyer for Vanessa Arce, the only appeal so far before the Court of Appeals you didn't participate on; what is your role?

A. I handle both appellate matters in this and in the underlying case I've handled trial proceedings -- I've been involved in this probate proceedings through the whole time.

Q. But the only appellate matter in this case you were not involved in, right?

A. I was not involved in the decision to file a Notice of Appeal from a discovery rule, correct.

Q. Because the appeal was frivolous, right?

A. It was the wrong procedural mechanism.

Q. Was it an attempt to actually try to get away

from complying with Judge Garza's orders?

A.   No.   Not that I know of.

Q.   How would you know that?

A.   I mean, I don't know but it wouldn't be -- from my perspective it wouldn't have been.

Q.   What was the purpose of it, then?

A.   Well you'd have to ask Mr. Balmer, but I think it was to challenge the ruling, to challenge why the Court changed it's mind.

Q.   What is your prediction on what is going to happen on this appeal?

A.   I think this appeal will be dismissed.

Q.   And why would you need appeal if you claim you've already produced everything to me?

A.   Like I told you, I didn't file the Notice of Appeal.

Q.   So the answer is you don't know.

A.   Like I said, I didn't file the Notice of Appeal.

            THE COURT:   It's been asked and answered.

            MR. RODRIGUEZ:   May I approach, Judge?

            THE COURT:   Yes, sir.

Q.   (By Mr. Rodriguez)   This is the first supplement to the motion -- have you seen that before?

A.   Actually.   I hadn't.   I was --

            THE COURT:   This is considered Exhibit 6.

THE WITNESS: I was looking for it today when I received your second supplement but I have no record of having received it.

Q. (By Mr. Rodriguez) You understand everything is e-filed now, right?

A. Most things are, yes.

Q. And as an appellate lawyer I'm sure you know how to get access if you filed documents?

A. Yeah, they're generally served on people.

Q. Yeah, I mean, but you know how to get them, right?

A. No. They're generally served on you cause the rules require you to get served with documents.

MR. RODRIGUEZ: May I approach, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Rodriguez) I show you Plaintiff's Exhibit 7, this is the second supplement. My question to you now, Mr. Anderson, do you know how to obtain a copy from a file, from the Court's file, as an appellate lawyer?

A. As an appellate lawyer or just a lawyer in general, yeah. You call the clerk and you can get a copy. Generally, you don't have to do that cause you get served with copies.

Q. Did you talk to Mr. Balmer about the hearing

today?

A. I did. I spoke to him briefly this morning.

Q. By the way, this isn't the first time you have been involved, you personally, have been involved in a probate matter where you all have refused to produce discovery, correct?

A. I don't know what you're talking about but if you're talking about something in the Aguilar case we can talk about that.

Q. No, let's talk about another case.

MR. RODRIGUEZ: May I approach, Judge?

THE COURT: Yes, sir.

Q. (By Mr. Rodriguez) This is in the Estate of Arizola are you familiar with that case?

MR. RODRIGUEZ: This is Exhibit 9, Judge.

THE WITNESS: Yes. This was an appeal from a Court's order approving a settlement and denying your request for discovery and the Court of Appeals reversed that decision based on that you were entitled to discovery.

Q. (By Mr. Rodriguez) Yeah, they reversed an order that you had told the Judge to sign that prohibits discovery in a probate case, right?

A. We didn't tell the Judge to sign anything -- I wouldn't be so presumptuous -- we presented our

objections to the discovery you sought, the Judge agreed with us and entered an order.

Q. And you were telling the Judge that in probate matters, the interested party like us, are not entitled to look at or conduct discovery into the settlement of the estate, right, essentially that's what your argument was in that case?

A. Mr. Balmer was in the probate. As of that time it was roughly accurate but we haven't any -- thought of this case in over a year.

Q. County Court of Appeals supports that you were wrong -- you handled the appeal in that case by the way, right?

A. I did. The Fourth Court of Appeals said I was right in most everything if you probably recall, but --

Q. We're talking about discovery?

A. Well, in the discovery you got one out of them, yeah.

Q. And that's the one that's actually relevant to this case, we're entitled to conduct discovery, true?

A. I think these are two different cases.

Q. All right. If the Court finds that you and Mr. Balmer, on behalf of Vanessa -- by the way, Vanessa didn't participate in any of the decisions whether to give us documents or not give us documents, true?

A. I was not involved and I don't recall communications back when all this stuff was produced last fall so I don't know. I don't have any personal knowledge one way or the other.

Q. No, I'm talking from February or March when you received the order of February 13th. You never spoke -- you haven't spoken with Vanessa, right?

A. I have not spoken with Vanessa.

Q. To your knowledge did Mr. Balmer speak to Vanessa during that period?

A. I don't know.

Q. The decision whether to produce or not to produce the unredacted settlement agreement to me as ordered by the Judge, that would be a decision that you or Mr. Balmer made, correct?

A. I -- that's accurate, yeah.

Q. In other words, Vanessa has no fault in that, right?

A. I don't think Vanessa has any fault for that.

Q. Who is the main decision maker, Balmer or you, on this issue whether to produce the unredacted agreement and the other documents?

A. Well, the other documents were produced -- actually, all of them were produced. I mean, we discussed them but I don't know if one of us was more in

charge than the other. I think it was by consent that we both agreed that everything had been produced so, we complied.

Q. But you knew the unredacted copy was not produced to me?

A. It was produced to the Court as I told you time and time again.

Q. If everything was produced, then, Mr. Balmer, then everything in the appeal was moot at the time that it was filed, right?

A. I'm Mr. Anderson, but everything --

Q. Where's all the equal -- you just told me you all have equal play here, so --

A. Sure. But you called me Mr. Balmer -- I'm just correcting the record --

Q. All right.

A. Regarding everything that was produced, yeah, had I been asked ahead of time if I would've filed a Notice of Appeal I would've said no.

Q. Okay. And you plan to make a claim as an appellate lawyer in this case for your attorney's fees to get paid?

A. Yes. We'll be submitting fee statements for our fees to come out of the estate.

Q. You can't be serious, Mr. Balmer, you're

expecting this Court to approve your appellate attorney's fees on your own appeal that was frivolous and has been falsely made; that's what you want this Court to do?

A. Once again, I'm Mr. Anderson I'm not Mr. Balmer, and, two, I wouldn't have any fees relating to the appeal because I did not participate in filing a Notice of Appeal.

Q. You can't do that with a straight face, right, Mr. Anderson?

A. Can't do what with a straight face?

THE COURT: It's been asked and answered.

Q. (By Mr. Rodriguez) Can you show me the documents you claim that you produced to me?

MR. RODRIGUEZ: Your Honor, may he be excused --

THE COURT: He'll do so after he's through testifying and then at that time if you have anymore questions you can bring it up at that time.

MR. RODRIGUEZ: Pass the witness.

THE COURT: Thank you. Mr. Guillen, Mr. Lozano, do you have any questions?

MR. GUILLEN: Your Honor, really quick.

CROSS EXAMINATION

BY MR. GUILLEN:

Q.  Mr. Anderson, I have not been produced with the unredacted settlement also, right?

A.  I don't know.  I mean, know -- the only thing I know, Mr. Guillen, was that a copy was sent to the Court pursuant to the order that said the Court would receive it in chambers and would review it with I believe both the attorney ad litem and the guardian ad litem.

MR. GUILLEN:  For the record, I have not received it, Judge.

THE WITNESS:  I'm not arguing with you on that.  I don't know.

Q.  (By Mr. Guillen)  My concern is I know that the attorneys on this side are not billing by the hour, they are billing a fee at the end of it, but my concern is the attorneys on the other side are billing by the hour and as ad litem, I'm concerned about the estate and the assets that should be going to my clients, Carlos, Alyssa, Andrew, Marcus and Kaylee Aguilar.  So I would hope that the Court would take to consideration in trying to expedite this matter as fast as possible.

MR. LOZANO:  Your Honor, and I share the same sentiment as Mr. Guillen.

THE COURT:  Thank you.  Is there anything else, Mr. Anderson?

MR. ANDERSON:  No, I agree with those last

two statements, Your Honor, I would like to see all this end as well.

THE COURT: Thank you.

MR. RODRIGUEZ: I just have one.

THE COURT: Yes, sir.

REDIRECT EXAMINATION

BY MR. RODRIGUEZ:

Q. If you really claim that you produced all these documents to us, then why didn't you just tell us on the 30th day -- before the 30th day ran out to produce these documents -- why didn't you just send a letter saying Mr. Rodriguez, here are all the documents we've produced, here are all these orders we complied with; why didn't you do that?

A. Well, considering the Notice of Appeal was filed around the 30th day or whenever, my assumption is that Mr. Balmer's appeal or would have told you, I don't know.

Q. Okay. So what you're --

THE COURT: That's fine. It's been asked and answered, Mr. Rodriguez. Thank you, Mr. Anderson.

MR. RODRIGUEZ: Judge, just for the record, I have to say that I've never received -- and your order's crystal clear -- that I was to receive a copy of the unredacted order directly from him. I've never seen

it, I was never produced it, I was never provided for it.

THE COURT: In closing what is it that you're requesting, Mr. Rodriguez?

MR. RODRIGUEZ: We have an order, Judge, here, that I'm going to let my appellate counsel argue.

THE COURT: Make sure that whatever you give me is filed with the county clerk's office.

MR. RODRIGUEZ: And I will hand a copy here to counsel, Judge, so we can --

THE COURT: Yes. Your name for the record?

MR. SMITH: My name is Craig Smith.

THE COURT: Thank you.

MR. SMITH: Your Honor, what we're respectfully requesting the Court to do -- and I'm focusing on sanctions here, Your Honor -- we have heard direct evidence from the witness stand that Mr. Anderson and Mr. Balmer are the decision makers with respect to the decision on whether or not to produce the documents to us. We've heard direct evidence of that.

And we respectfully request that you sanction Mr. Anderson and Mr. Balmer -- and in particular Mr. Balmer who didn't even show up here. He is not here. So he has essentially defaulted with respect to this hearing. He should be sanctioned

because he is the guilty --

THE COURT: For the record, I want to tell you, he did file a Motion for Continuance but the Court has gone forth with the case.

MR. RODRIGUEZ: Judge, we filed a reply to that, we thought it was late, dilatory, inconclusive, doesn't have any specifics as to why he's not here.

THE COURT: Okay. Thank you.

MR. ANDERSON: Judge --

THE COURT: Yes, Mr. Anderson?

MR. ANDERSON: Can I just address that, Your Honor, cause it was filed this morning cause he woke up throwing up this morning --

MR. RODRIGUEZ: Objection. None of that is on the record --

MR. ANDERSON: I was just going to tell you he has been up throwing up. We discussed whether he should come down here, but frankly, I didn't want him riding in my car with me, throwing up on the two and a half hour ride down here.

MR. RODRIGUEZ: He threw up cause he was afraid to face justice, Your Honor.

THE COURT: Go ahead. Let's go ahead and proceed.

MR. SMITH: The TransAmerican National Gas

v. Powell -- is still the leading sanction that's in Texas -- specifically directs the Federal Court to focus on the guilty party. And the guilty party is number one, Mr. Balmer, and number two, Mr. Anderson. Because they haven't produced all the documents to the response and to your order. They haven't.

When they say, "Well, we produced some of them," that's not enough. We're entitled -- in this particular probate proceeding, the key issue before the Court -- one of the key issues before the Court is whether or not illegal fee contracts have been or were planned to be paid to lawyers on issues that involve the estate and the division of the estate and where is the money going -- that's critically important.

THE COURT: Mr. Smith, wouldn't it be wise for the Court to order -- based on what you're saying -- an unredacted copy of the settlement agreement that would spell out all the attorneys' fees to everyone and contracts and things like that; wouldn't it not spell it out there?

MR. SMITH: No, sir.

THE COURT: Explain it to the Court why not.

MR. SMITH: Typically, the way these bills work is there is an original fee contract signed by the originating lawyer who gets to the accident scene first

or however they get it, and it's 40 percent contract and it's signed up by the originating lawyer or a person acting on behalf of the originating lawyer. Okay. After that there is a process of secondary fee contract that are under the umbrella of a primary fee contract.

The lawyer who tries the case gets a percentage, the appellate lawyer gets a percentage, the case runners get a percentage. Everybody gets a percentage.

THE COURT: But is that under that 40 percent margin from the original contract that got signed or do the numbers change for the secondary lawyer and third lawyer that comes into the case?

MR. SMITH: The numbers change because they are splitting up the 40 percent pie.

THE COURT: But do they go past the 40 percent?

MR. SMITH: Never.

THE COURT: It's important for the Court to know that.

MR. RODRIGUEZ: The answer, Judge -- and I've seen some of the contracts that they've produced -- and the answer is it could. When they hire somebody else it could bump up, depending on the contract --

THE COURT: They go back and amend that

original contract?

MR. RODRIGUEZ: They could. But what we're talking about here, Judge, just so the Court knows, is that mediation -- cause there are several documents and they have not produced all the documents -- the one that we have not seen is the unredacted mediated global settlement agreement. That was done at mediation -- I assume it's some sort of settlement agreement that has everybody's global -- and that has an amount and I don't think it has how it's going to be divided up. I don't know, I haven't seen it.

Separate and apart from that, Judge, I will tell you this, I was out there the last time we were trying to settle the case, and Mr. Anderson was there -- even though he denies it on the stand -- and Mr. Hagood was there and they said they could not settle with me because Raul Vasquez had not approved that deal we were talking about. So the only way that Raul Vasquez or anybody else could have any say so in whether this case is settled or not is for them to have some sort of interest in it.

If they have an interest in a contingency case, the Court knows it must be in writing. It must be. Otherwise it's illegal and unethical.

THE COURT: Let me allow Mr. Smith, tell me

what is it specifically that you are requesting the Court to do?

MR. SMITH: Your Honor, first of all, I'm requesting sanctions and, then, also in my sanction order that I have proposed here, I'm asking -- respectfully requesting -- this Honorable Court to order them again to comply with the order.

In other words, I don't believe them when they say they produced it. And I'll tell you why. The reason why is because once this purported contract is signed then there is always a bunch of secondary agreements that split up that 40 percent between or among different players.

THE COURT: Why would it matter to get those secondary contracts?

MR. SMITH: It has to do with, number one, the transparency of the probate process, and number two, you as the probate judge have a unique function, which is to absolutely safeguard those probate assets.

If those funds are being paid on illegal contingent fee contract or illegal fee splitting contract, you need to forfeit those fees and put it back into the estate so they can be properly divided amongst the people that must use those. And that is one of your primary functions.

THE COURT: Okay. If we can go back now, more specifically, there's some blanks on here so if you can just go down the list because I've got several other cases the Court has to hear.

MR. SMITH: First of all, respectfully, requesting --

THE COURT: And for the record, the Court is going to just get a copy of the transcript right after this and go over the whole argument again. At least be specific for all your blanks that you have there.

MR. SMITH: Number one, I'm asking to reorder them to produce everything you've ordered them to produce before because we don't believe them and we believe that with reordering them we're going to get more documents.

And the reason why we know there are more documents out there is because when we tried to settle with these guys -- the way the dynamics work is once that there's a settlement, then everybody that has a percentage will just dig their heels in and they won't pay more than their percentage on the settlement.

And so what that means is that everybody in that 40 percent gets to veto their settlement because nobody is going to give up any extra money; you understand that? And so when we make them an offer,

they have to get everybody's consent to settle otherwise they might even say I'm not paying more than my share.

THE COURT: This is why as lawyers we don't have a very good -- sometimes a good reputation -- because of issues similar to this.

MR. RODRIGUEZ: Some of us have an excellent reputation, Judge. It's a select --

THE COURT: Many of them do but that's why we have these issues. Some of us have.

MR. ANDERSON: Judge, we, you know, we --

THE COURT: I'm aware.

MR. RODRIGUEZ: It's a select few, Judge, that makes others look bad.

THE COURT: Okay. Go ahead.

MR. SMITH: Your Honor, I have a case here for you that is called -- it's a Fourth Court of Appeals -- this is called the Prize Energy versus Cliff Hoskins Case, it's 345 S.W.3d 537 -- this case says that when you're dealing on a sanctions issue we don't have to put a lawyer on the witness stand to prove what's reasonable and necessary. Okay. So you can just give us a number, okay.

THE COURT: Okay.

MR. SMITH: So what we're respectfully requesting the Court to do is on the first one the Court

orders Balmer to pay attorneys' fees to our side as a sanction of $100,000. Okay. Ryan Anderson -- we think he's less culpable -- we just want 50 from him, okay. Vanessa Arce, we want a nominal number from Vanessa because they both testified that she is not the decision maker and we believe them.

Because when it comes to squabbling over percentages of 40 percent, how is Vanessa going to understand these dynamics. So we think the only number that should be put in her slot, if any, is a nominal number for failing to supervise highly sophisticated lawyers that are manipulating. That's what we think, that she bears some responsibility because you appointed her, and she has a fiduciary obligation to the estate. But she does have -- does not have clean hands, she has unclean hands to that extent.

Now, on this last paragraph here, the Court orders Balmer, Anderson, and Vanessa Arce, each pay "X" dollars per day. We believe, Your Honor, that this is one of the most important paragraphs. You should order these people to pay 10 or $20,000 per day until they follow your order. After a week or two, somebody's going to wake up and smell the coffee and comply. That is the most important part of this order that there's substantial per diem money order telling them to comply.

Now, why do we know that they're withholding documents? Balmer is not here. They filed a frivolous Notice of Appeal to challenge your order. And he admitted on the witness stand that that was gonna moot appeal if they had already produced everything. Why would they fight production if they really had anything that was -- that they produced everything.

THE COURT: Okay. Can we move on?

MR. SMITH: Yes.

THE COURT: To the last paragraph. "In the event that any person sanctioned by this order" -- go ahead.

MR. SMITH: Yes. For appellate attorneys' fees, what we're respectfully requesting this Court to do is to assess $25,000 sanction for review to the Court of Appeals -- of course, that's additional -- and $25,000 if review is sought in the Supreme Court of Texas. This sanction, Your Honor, $25,000 per layer of the appellate review is not just reasonable, it's actually extremely --

THE COURT: That I understand.

MR. SMITH: I can testify, Your Honor, that the cost for handling appeals is close to 50,000 per layer of appellate courts if it goes to Court of Appeals it's going to be at least 50, reasonable and necessary

fees. The work is substantial, requires briefing, takes a lot of effort and the effort is on demand when the courts demand that you file your briefs. It's a very --

THE COURT: I'm aware of that.

MR. SMITH: -- substantial responsibility and the same in the Supreme Court of Texas.

THE COURT: Thank you.

MR. RODRIGUEZ: Judge, may I just have thirty seconds?

THE COURT: Briefly, I've got to give him a chance.

MR. RODRIGUEZ: Real quick, Judge. As Your Honor knows, Your Honor is only as honorable as people are willing to enforce the Court's orders. If people don't respect your Court's orders or don't respect you, Judge, we're all here for nothing. And the contempt that these individuals have for your order, "well, I did this, yeah, I submitted that," they were just nonresponsive, never gave any documents.

What a flagrant disrespect to Your Honor. Instead of complying it, move with this, they go and they file a frivolous Notice of Appeal. And that's why in three days, Judge, I filed a Motion to Dismiss -- and it will get dismissed. They did it to probably intimidate Your Honor, I think, to scare Your Honor

away. They had all sorts of evil ugly motives. And how he can sit there and laugh, Judge, he's the appellate lawyer.

That's shockingly unbelievable that his only purpose here is appellate lawyer, and the only appeal they filed he claims to know nothing about? That's disrespectful to the Court's oath.

THE COURT: Let me --

MR. RODRIGUEZ: It's a flagrant disrespect to this Court, Judge, and they should be held accountable.

THE COURT: Thank you. Mr. Anderson, let's go back again, what is it that you're recommending the Court to do?

MR. ANDERSON: I would recommend that you deny this Motion for Contempt. Your Honor, I will take it seriously and I will address every point but I think it's absolutely absurd that they are bringing this. There is no contempt for this Court whatsoever. Opposing counsel is different fees but --

MR. RODRIGUEZ: Judge --

THE COURT: But --

MR. ANDERSON: Your Honor, we have produced everything. I mean their argument of, "we know there are more documents" --

MR. RODRIGUEZ: They do have documents, Judge.

MR. ANDERSON: Counsel, I stayed quiet during your argument.

THE COURT: The only issue here for the Court, number one, is the unredacted report.

MR. ANDERSON: And the unredacted settlement agreement. You recall, you ordered us to produce it to you in chambers and you were going to review it with the guardians and the attorneys ad litem. We produced it to you and then you had in your order the right to turn it over to them. So we assumed it was produced.

THE COURT: All right. Secondly, they're telling the Court that there's other split fee arrangement contract; is there anything else out there?

MR. ANDERSON: There is not, Your Honor, they're making that up. I mean what they tell you --

THE COURT: Does Judge Vasquez have some type of a contract out there?

MR. ANDERSON: None. None that I know of in any of this, Your Honor. What I know is from Mr. Balmer because I was with him --

THE COURT: And you're willing to put it in writing with the Court, in some type of a deposition or some type of document saying that --

MR. ANDERSON: Absolutely. Whatever it is that you need typed, what I was telling you from the stand that is absolutely what I know. If you want me to go ask people, specifically, cause my understanding of this -- and remember I was not the underlying trial lawyer who signed this up it was Mr. Solis and Mr. Castillo -- but these agreements, this is everything that they have, that I know of. I'm happy to go back and ask again but there is nothing else, Your Honor.

THE COURT: All right. Mr. Guillen, do you have a response to this motion?

MR. GUILLEN: Your Honor, the only thing I would like to say of the unredacted settlement statement is put that to a rest and hopefully bring this to an end. As I stated, my concern is the equity of this estate that's going to be depreciated and that money should be going to the wards of this case. As far as the back and forth, I -- obviously, I -- I'm believing that appeal was frivolous when I got it, it was just deceiving --

THE COURT: All right.

MR. GUILLEN: Judge, I recall Your Honor ordering, in open court, that that unredacted settlement was going to be produced to me.

THE COURT: Do you have any specific comment

concerning the request for attorneys' fees against Mr. David Balmer, Mr. Ryan Anderson and Vanessa Arce or any other matter that you would like to specifically address?

MR. GUILLEN: I think some compensation should be made but I'll leave that up to Your Honor's discretion simply because what was suppose to be produced was not.

THE COURT: I need to wrap this up, anything else?

MR. GUILLEN: No, Your Honor.

THE COURT: Mr. Lozano, anything else?

MR. LOZANO: No, Your Honor, I did speak with Mr. Anderson a couple of weeks ago and he had mentioned to me that he had produced the unredacted settlement agreement to the Court, so I would just like access to those so we can wrap this up.

THE COURT: Okay. I'm going to let Mr. Anderson finish. Go ahead.

MR. ANDERSON: And I can provide you, Your Honor, with the mail tracking -- overnight mail -- as soon as you signed the order saying get the unredacted settlement agreement. I'm surprised that these ad litems haven't seen it because it was being produced to you specifically to share with them. A couple of points

on this appeal. Mr. Balmer filed a Notice of Appeal, was it the wrong document? Yes. And when I was looking back at the date of it, the reason he didn't confer with me and I didn't see it beforehand cause I had my Boy Scouts in the Bahamas March 13th so I wasn't around at that time.

I guess I don't need to address this -- I think the Court has recognized -- the important thing is there's a 40 percent, you've already approved that contract, that has already been done. And whatever the sub agreements are split, it never gets above 40 percent. But whatever the agreements are, they've been produced. There aren't any.

If the Court wants me to go back so that I can come in front of you and put my hand on the Bible and swear that there aren't anymore --

THE COURT: If you can be more specific as to Mr. David Balmer's -- the attorney fee issues against Mr. Balmer -- is there anything you want to tell me for the record?

MR. ANDERSON: Yeah, I don't think Mr. Balmer should have to pay any attorney fees whatsoever, Your Honor, I don't think he's been obstructionist, I don't think he's done anything improper.

As the Court probably remembers, Mr. Balmer and I have made three or four trips down for hearings on this very issue only to arrive and be told it wasn't going to be heard and turn around and drive back. We have not prolonged this proceeding, we don't have any other documents to give, there has been no obstructionism of whatsoever.

THE COURT: These issues --

MR. RODRIGUEZ: Judge --

THE COURT: Let me just finish this with him. "Any fees as against the daily running of the -- until the discovery issue be resolved," about something -- the request they're making for $10,000 dollars a day. I need to put it on the record because it's going to be appealed one way or another so might as well put it on the record, anything else you want to tell me?

MR. ANDERSON: Absolutely. I would say, Your Honor, there is nothing more to be produced of this, you know, "until there's compliance" -- I'm not sure exactly what the compliance is.

THE COURT: They want the unredacted global agreement that they're talking about.

MR. ANDERSON: And if you're going to tell us that to hand it to them, we can hand it to them, I

don't care. It was already produced.

THE COURT: All right. Is there anything else you want to tell me?

MR. ANDERSON: Yes, I guess, I find this highly offensive to come down here and have someone ask me for $150,000 in attorneys' fees against Mr. Balmer and myself when we've done everything. I mean, this settlement has already been approved. They can't appeal. Now, Mr. Rodriguez likes to tell you, "Oh, it's a global settlement and we're going to see that there's no allocation." That's flat outright wrong. And the Court knows that because we gave you the agreement and the agreement specifically shows that it was allocated.

Moreover, as we told you in the letter that we sent with the agreement that under Burrow v. Arce, a global settlement is only improper if the clients don't consent to it. And the settlement agreement was signed by each and every client. So even if it was global, which it isn't, it's still an appropriate settlement agreement because they had agreed to it and the Court approved it. So we're now in the point where --

THE COURT: In closing, Mr. Rodriguez?

MR. RODRIGUEZ: Judge, what I find offensive is the fact that they can look at you in the eye and still say that they've done everything possible to

comply with the Court's order except what the Court ordered. Because the Court order was very simple. Produce the document by February -- 30 days after February 13th -- it's very simple, very clear. Produce the document to me. They didn't do that. That's very simple.

By the way Judge, they have not produced all the documents. They have not. It would have been very simple to say here is the Baste stamped documents -- I think these lawyers should know how to comply -- even bad lawyers know how to comply with Court orders. The respond and they say here is the document pursuant to Judge Garza's order, documents 1 through 50, here they are. Wrong. But no.

What they did is they disrespected you, and they go file and they file a frivolous Notice of Appeal and claim now stupidity, the Boy Scouts -- even pulled the Boy Scout's card, come on. I mean, sometime between the 30 days you couldn't figure out a way to comply with the Court's order. Judge, it's extremely disrespectful.

THE COURT: At this time the Court is going to consider your request, Mr. Rodriguez, and if you have a proposed order please file it by tomorrow, I will make a ruling by tomorrow afternoon. Tomorrow Wednesday if not Thursday morning.

MR. RODRIGUEZ: By the way, Judge, I'd invite the Court to also look -- these lawyers have a pattern of practice of doing this, I'd like the Judge to look at the Arizola case. That's what they do.

MR. ANDERSON: That's absurd.

THE COURT: Thank you. Court will take a short recess.

(Proceedings concluded)

THE STATE OF TEXAS §

COUNTY OF WEBB §

I, Roxann Soto, Official Court Reporter for the County Court At Law Number 2 of Webb County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $354.00 and was paid by Mr. Ronald Rodriguez.

WITNESS MY OFFICIAL HAND this the 12th day of June, 2015.

_____
Roxann G. Soto, Texas CSR #5780
Expiration Date: 12/31/2016
County Court at Law No. 2
1110 Victoria, Ste. 404
Laredo, Texas 78040
Office (956) 523-4332
Fax (956)523-5075